IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| **JULIE P.[1],** | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) Civil Action No. 7:20cv00023 |
| | ) |
| **ANDREW SAUL,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

**REPORT AND RECOMMENDATION**

Plaintiff Julie P. ("Julie) filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding her not disabled and therefore ineligible for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433; 42 U.S.C. § 1381-1383f. Julie alleges that the Administrative Law Judge ("ALJ") erred by failing to properly: (1) assess her RFC; (2) weigh the medical opinions of Susan Latta, Q.M.H.P and Lola Byrd, Psy.D.; and (3) assess the impact of her part-time employment. I conclude that substantial evidence supports the Commissioner's decision in all respects. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 18), and **DENYING** Julie's Motion for Summary Judgment (Dkt. 16).

**STANDARD OF REVIEW**

This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Julie failed to demonstrate that she was disabled

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

under the Act.² Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). "The inquiry, as is usually true in determining the substantiality of evidence, is case-by-case." Biestek, 139 S. Ct. 1148. The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Julie filed for SSI and DIB benefits in December 2015, claiming that her disability began in June 2015, due to severe post-traumatic stress disorder ("PTSD"), fibromyalgia, panic attacks, bipolar disorder, generalized anxiety disorder, depression, anxiety, narcolepsy, dyslexia, and

---

² The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

2

migraines.[3] R. 221, 251.[4] The state agency denied Julie's claims at the initial and reconsideration levels of administrative review. R. 67–81, 83–97, 99–114, 117–32. ALJ David S. Lewandowski held a hearing on August 8, 2018 to consider Julie's claims for DIB and SSI, where vocational expert Mark Hileman testified and Julie was represented by counsel. On December 4, 2018, the ALJ entered his decision considering Julie's claims under the familiar five-step process[5] and denying her claim for benefits. R. 15–35.

The ALJ found that Julie suffered from the severe impairments of bipolar disorder, PTSD, major depressive disorder, migraines, obstructive sleep apnea, narcolepsy, colitis, plantar fasciitis, and obesity.[6] R. 17. The ALJ determined that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 19. Specifically, the ALJ considered respiratory disorders, including listing 3.09 (chronic pulmonary hypertension due to any cause), listing 4.02 (chronic heart failure), listing 5.06 (inflammatory bowel disease), listing 12.04 (depressive, bipolar, and related disorders), and listing 12.15 (trauma and stressor related disorders). Id. The ALJ also considered Julie's obesity in relation to the other listings. R. 19–20.

---

[3] Julie was 33 years on her alleged onset date and 36 on the date of the ALJ's decision, making her a younger person under the Act. R. 67.

[4] Julie's date last insured was December 31, 2020; thus, she would need to show that her disability began on or before this date and existed for twelve continuous months to receive disability insurance benefits. R. 15; U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a).

[5] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the RFC, considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

[6] While the ALJ found that Julie's "possible fibromyalgia" was not a severe impairment, he noted he considered all of Julie's complaints of pain, "regardless of the source." R. 18.

The ALJ found that, regarding her mental impairments, Julie had mild limitations in understanding, remembering, or applying information, and moderate limitations in interacting with others, concentration, persistence, or pace, and adapting or managing oneself. R. 20–21.

The ALJ concluded that Julie retained the residual functional capacity ("RFC") to perform a limited range of light work. R. 22. Specifically, Julie can perform occasional postural activities but can never climb ladders, ropes, or scaffolds, and should avoid exposure to loud noise, such as heavy traffic and industrial hazards, and pulmonary irritants. Id. Further, Julie can understand, remember, and carry out simple instructions and perform simple tasks, and can adapt to occasional changes in the customary workplace setting as long as they are gradually introduced. Julie can have occasional interaction with others and she is expected to be off task less than 10% of the workday and absent one day per month. Id. The ALJ determined that Julie was unable to perform her past relevant work as a janitor, casher checker, and companion, but that she could perform jobs that exist in significant numbers in the national economy, such as marker, clothing bagger, and housekeeping cleaner. R. 33–34. Thus, the ALJ concluded that Julie was not disabled. R. 35. Julie appealed and the Appeals Council denied her request for review on November 22, 2019. R. 1–3.

## ANALYSIS

Julie alleges that the ALJ failed to properly: (1) assess her RFC; (2) weigh the medical opinions of Susan Latta, Q.M.H.P and Lola Byrd, Psy. D.; and (3) assess the impact of her part-time employment.

### A. Medical History Overview

Julie has a history of mental health complaints and treatment, including for depression

4

and anxiety.[7] Julie had in-patient hospitalizations in June 2015, following her husband's suicide, and again in October 2015.[8] R. 703, 754. Julie also received regular outpatient psychiatric treatment from Blue Ridge Behavioral Services, including group and individual counseling from 2015 through 2017. During these sessions, Julie consistently reported feelings of stress, anxiety, and depression, as well as PTSD symptoms, including nightmares. However, Julie also reported positive events, such as plans to marry her fiancé, regaining custody of her son, and that her medication "has helped a great deal." R. R. 986–87, 1145. In April 2017, Julie began participating in frequent mental health building sessions, with individual counseling in her home, where she had reported continuing anxiety, but indicated her boyfriend and boyfriend's family were a source of support.[9] R. 1182. Julie saw Dr. Byrd for psychotherapy sessions from in September 2017 through July 2018, with Dr. Byrd consistently listing her level of functioning as fair. R. 1626–39.[10] In January 2018, Julie reported being "less stressed and happier" since she was able to bring about $800 a month from a part-time job. R. 1613. By April 2018, she was making "great progress" in maintaining appointments and taking her medications, and she reported decreased isolation and increased involvement in activities, such as attending a gym and coaching her son's weekly bowling team. R. 1605, 1609.

---

[7] Julie reported having symptoms of depression since "approximately age six, secondary to childhood abuse for which she received multiple years of counseling." R. 1319.

[8] Julie's son was removed from her care while she was in inpatient hospitalization in October 2015; however, she was subsequently able to regain custody. R. 950.

[9] These sessions focused on her day-to-day struggles and goals, and Julie continued to consistently report depression, anxiety, and PTSD symptoms to her medical providers. R. 1308, 1319, 1334.

[10] During this timeframe, Julie also received mental health services at Mainstream Mental Health, where she was assessed with major depressive disorder and PTSD. R. 1571.

Julie also consistently complained of migraine headaches, even prior to her alleged onset date in 2015. On multiple occasions in 2015, 2016, and 2017, Julie presented to the emergency department reporting severe headaches, including nausea and light sensitivity. R. 417, 1065, 1072, 1222. In 2017, Julie was referred to neurology, and explained that her headaches had been "uncontrolled" since 2015, when she witnessed her husband's suicide. R. 1218. Julie experienced some migraine relief with botox injections beginning in May 2017, reporting an "improvement in headache pattern." R. 1374, 1453.

1. Medical Opinion Evidence

In August 2016 and May 2017, respectively, state agency psychologists Alan Entin, Ph.D. and Stephen Saxby, Ph.D., reviewed the record and found Julie capable of working, though they found her ability to sustain a competitive work pace would be moderately limited, and likewise limited her interaction with the public and changes to workplace layout and routine. R. 77–79, 111–12. Dr. Saxby explained that Julie could "maintain concentration and attention for two hour periods in order to complete an eight hour day. She would be able to complete a normal work week and to perform at a pace generally consistent with others, with only minimal need for accommodations on an infrequent basis." R. 111. The ALJ gave both of these opinions significant weight, but noted that Dr. Saxby is "given slightly more weight than Dr. Entin's opinion because [Dr. Saxby] reviewed more of the evidence and evaluated [Julie] under the new B criteria standard." R. 30.

State agency physicians Patricia Staehr, M.D. and Vinh Luc, M.D., also reviewed the record and found Julie capable of a range of heavy work, with certain postural and environmental limitations. R. 75–77, 109–10. The ALJ gave these opinions limited weight, finding that Julie

was "more limited, mostly based on her morbid obesity," and confining her to a limited range of light work. R. 31.

In April 2018, Ms. Latta, QMPH, filled out a Medical Source Statement of Ability to Do Work-Related Activities (Mental), where she found a number of marked and extreme limitations, including in Julie's ability to carry out short, simple, instructions, perform at a consistent pace, or complete a normal workday or workweek, due to her "extreme pain" and narcolepsy. R. 1244-46. The ALJ gave this opinion little weight, noting it was inconsistent with both Ms. Latta's own treatment notes and the other medical evidence. R. 31.

In July 2018, Dr. Bird also filled out a Medical Source Statement of Ability to Do Work-Related Activities (Mental), where she found Julie had a mix of limitations from mild to extreme, with mild to moderate limitations in carrying out short, simple instructions, extreme limitations at performing at a consistent pace, and marked limitations in responding appropriately to changes in a routine work setting, which she attributed to Julie's PTSD and morbid obesity. R. 1566–68. The ALJ likewise gave this opinion little weight, noting it was not consistent with Julie's mental status findings, which were largely normal. R. 31.

## B.  RFC Assessment

SSR 96-8P requires the ALJ to include a narrative discussion describing how the evidence supports his conclusions when developing the RFC. Teague v. Astrue, No. 1:10-cv-2767, 2011 WL 7446754, at *8 (D.S.C. Dec. 5, 2011).   The ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8P at *7; Meadows v. Astrue, No. 5:11-cv-63, 2012 U.S. Dist. LEXIS 115150, at *24, 2012 WL 3542536, at *8 (W.D. Va. Aug. 15, 2012) (citing Davis v. Astrue, No. 9-cv-2545, 2010 U.S.

7

Dist. LEXIS 132972, at *15-16, 2010 WL 5237850, at *5 (D. Md. Dec. 15, 2010)); Monroe v. Colvin, 826 F.3d 176, 189, (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often).

Julie argues that the ALJ failed to properly assess her RFC. Specifically, Julie asserts substantial evidence does not support the ALJ's conclusion that she would be off task less than 10% of an eight hour workday and would miss one day of work per month. Julie challenges the explanation that, because Julie met her objective of coaching her sons sporting events and working at fundraisers 90% of the time, this "suggests she would not be off task more than 10% of the time." R. 30. While the ALJ does point to Julie's report of meeting these objectives 90% of the time, his primary support for that RFC finding was state agency psychologist Dr. Saxby's opinion that Julie would be "able to complete a normal work week and to perform at a pace generally consistent with others, with only minimal need for accommodations on an infrequent basis." R. 30, 111. The ALJ wrote:

> [Dr. Saxby] noted [Julie] may need a minimal, infrequent accommodation to complete a normal workday or workweek at a normal pace. Therefore, [I] find she may be off task up to, but not including, 10% of the workday. This would certainly be enough to accommodate a minimal, infrequent accommodation.

R. 30. Elsewhere in the opinion, the ALJ noted that the record shows Julie "generally did not complain to her treating" doctors of "serious difficulty maintaining concentration, persistence, and pace," mental status examinations showed no serious problem completing calculations, treating doctors did not observe that Julie was "overly distractible or slow," and she reported watching television, and "keeping up with her son with autism," as well as other daily tasks

8

which require some concentration, persistence, and pace.[11] Thus, I find the ALJ adequately explained and supported his finding regarding how much Julie would be off task.

Julie also states that he ALJ improperly discounted her mental health diagnoses "because they were not present at every single visit with every single practitioner." Pl's. Br. at 8, Dkt. 16. As an initial matter, I note that the ALJ found Julie had severe impairments of bipolar disorder and PTSD. R. 17. Further, the ALJ did not overlook either references to Julie's PTSD, or that she required some reminders or assistance in performing household chores; instead, the ALJ considered the record as a whole and adequately explained how he determined the RFC. While the ALJ acknowledged Julie's allegations of "significant mental symptoms, such as poor memory, concentration, and social functioning," as well as her testimony that she has PTSD from traumatic events, he noted that her treating doctors usually noted normal mental status at appointments, with the exceptions of depressed mood and affect. R. 23, 32. Indeed, the ALJ specifically pointed out that Julie "did many activities that are wildly inconsistent with her allegations of disability at the hearing." R. 33. As examples, the ALJ highlighted that while Julie claimed she cannot be around anyone besides her family and mental health workers due to anxiety, her records show no problems being around others at group therapy and also indicate she worked 20 hours a week at a convenience store, coached her sons' sports teams, and participated in fundraising, reportedly without panic attacks from interacting with people in these public places. R. 24, 33.[12] The ALJ also limited Julie to only occasional, not frequent, interaction

---

[11] Other tasks that Julie reported to her doctors included living at home with her fiancé and caring for her basic needs, cooking, cleaning, maintaining the home, doing yard work, coaching her son's baseball and bowling team, and working part-time. R. 24, 26 951, 1609.

[12] The ALJ also highlighted other "wild inconsistent[cies]" related to Julie's claimed physical impairments, including her testimony that she "pretty much lives in the bathroom" due to diarrhea, limps due to excruciating pain, and needs help standing, compared to evidence from the record that she attended a gym, including walking on a treadmill, biking, and light weight lifting, did laundry, mowed the grass, and worked part time at a convenience store. R. 33.

9

with others based on the opinion of the state agency psychologists. R. 30. He continued, specifically explaining that Julie "reported going to many events with her son and working 20 hours a week in a convenience store, suggesting she has the capacity for at least occasional interaction with the public." Id.

Lastly, Julie argues that the ALJ "barely acknowledged" her migraine headaches and proposes that the ALJ should have included an RFC providing for two or more absences a month due to headaches. Pl.'s Br. at 9, Dkt. 16. Contrary to Julie's arguments, the ALJ discussed her testimony regarding the frequency of her migraines,[13] provided a detailed discussion of her neurological treatment related to her migraines, and determined Julie's migraines were a severe impairment. R. 23, 27–29. The ALJ specifically included in his opinion imaging studies, as well as Julie's migraine history, indicating increased headaches following her husband's death in 2015[14], but migraine improvement following starting Botox injections. R. 27–28. The ALJ appropriately constructed an RFC that specifically limited Julie's "exposure to loud noises due to her migraines" and indicated she "might also be absent one day per month due to migraines or exacerbated mental symptoms." R. 31.

At bottom, the ALJ adequately explained how the evidence supports his conclusions regarding the RFC, including a detailed discussion of Julie's medical history, the medical opinions, and her own allegations. I find that substantial evidence supports the ALJ's conclusions regarding Julie's RFC.

---

[13] The ALJ specifically noted Julie's testimony that she has severe migraines two or three times a week that last from 12 to 24 hours. R. 23, 56.

[14] Indeed, as the ALJ noted, her treating neurologist stated her "symptoms were probably 90 % [a] stress reaction . . . ." R. 27.

## C. Medical Opinions

1. <u>Dr. Byrd - Treating Physician</u>

Julie argues that the ALJ erred in giving little weight to the opinion of Dr. Byrd. Julie complains that the ALJ "overlooked a long-term history of mental health impairments" as well as "specific findings from Dr. Byrd" in the record. Pl.'s Br. at 10, Dkt. 16. The Commissioner counters that the ALJ's provided logical reasons for the weight given to Dr. Byrd, and that Dr. Byrd's own examination findings did not support her opinion.

Dr. Byrd completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) in July 2018, including findings that Julie had a moderate to marked impairment in the ability to maintain attention and concentration and complete a normal workday or workweek, as well as marked or extreme limitation in the ability to work near others without being distracted, perform at a consistent pace, maintain regular attendance, and respond appropriately to work pressures. R. 1566-68.

The social security regulations require that an ALJ give the opinion of a treating source controlling weight if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record."[15] 20 C.F.R. § 404.1527(c)(2); <u>Mastro v. Apfel</u>, 270 F.3d 171, 178 (4th Cir. 2001); <u>Brown v. Comm'r Soc. Sec. Admin.</u>, 873 F.3d 251, 269 (4th Cir. 2017) (noting that "the ALJ is supposed to consider whether a medical opinion is consistent, or inconsistent, with other evidence in the record in deciding what weight to accord the opinion"). Thus, "[b]y negative

---

[15] The social security regulations regarding the evaluation of medical opinion evidence have been amended for claims filed after March 27, 2017. <u>See</u> 20 C.F.R. §§ 404.1520c, 416.920c (setting out rules for claims filed on or after March 27, 2017, including that no specific evidentiary weight will be given to any medical opinions). However, as this claim was filed prior to the effective date of the amended rule, I will apply the rules in 20 C.F.R. §§ 404.1527(c), 416.927.

11

implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). The ALJ must give "good reasons" for not affording controlling weight to a treating physician's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Saul v. Astrue, No. 2:09–cv–1008, 2011 WL 1229781, at *2 (S.D.W.Va. March 28, 2011). Further, if the ALJ determines that a treating physician's medical opinion is not deserving of controlling weight, the following factors must be considered to determine the appropriate weight to which the opinion is entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R. §§ 404.1527(c)(2)-(5), 416.927(c)(2)-(5). "None of these factors may be omitted or disregarded by the ALJ in weighing the value of a treating physician's opinion." Ricks v. Comm'r, No. 2:09cv622, 2010 WL 6621693, at *10 (E.D.Va. Dec. 29, 2010). However, the ALJ "need not mechanically discuss every factor when choosing to afford a treating physician's opinion less weight, as long as the ALJ articulates the reasoning behind the decision." Haass v. Comm'r, Soc. Sec. Admin., No. CV BPG-17-1639, 2018 WL 2118705, at *1 (D. Md. Apr. 4, 2018).

Here, the ALJ appropriately considered these factors and the record, in weighing Dr. Byrd's opinion. The ALJ acknowledged that Dr. Byrd was a treating physician and Julie's psychiatrist, who provided "supportive and interactive therapy." R. 25–26. The ALJ explained why her opinion merited little weight, indicating:

> [Dr. Byrd's opinion] is not consistent with [Julie's] mental status findings. [Julie] had normal findings in most areas, such as memory, concentration, and thought process. She generally had normal interaction with treating practitioners. Dr. Byrd's own notes show she was focused and had normal attention and concentration. She had normal reality

12

testing and no problems with judgment, insight, or impulse control. [Dr. Byrd's notes] also show [Julie] reported improvement in December 2017 after she began working at the convenience store, and she reported improvement in early 2018.

R. 31. The ALJ pointed to specific records in his opinion, including where Dr. Byrd reported focused attention and concentration, linear thought process, normal judgment, insight, and impulse control in September 2017. R. 24, 637. Following that first visit, Dr. Byrd generally reported fair functioning.[16] R. 24, 1626, 1628, 1630–31, 1633, 1638. Further, the ALJ gave significant weight to the state agency psychiatrists, who both found Julie was capable of working. R. 30.

The ALJ adequately considered the factors outlined in 20 C.F.R. § 416.927(c)(2) and justified the weight afforded with specific reasons, including that, following her in-patient treatment in 2015, near her alleged onset date, she was "more stable" and usually had normal memory, concentration, and thought processing" and often had intact insight and judgment. R. 30, 31. I also note that the ALJ is not required to give any special weight to an opinion on issues that are reserved to the Commissioner, including a "statement by a medical source that you are 'disabled' or 'unable to work." See 20 C.F.R. § 404.1527(d)(3); see Mickles v. Shalala, 29 F.3d 918, 923 (4th Cir. 1994) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]."). Having reviewed the record as a whole, I conclude that substantial evidence supports the ALJ's decision to discount the opinions of Dr. Byrd.

---

[16] An exception was in November 2017, when Dr. Byrd reported poor functioning; however, the notes indicate her symptoms had been triggered by specific events. R. 1632.

13

2. <u>Ms. Latta, QMHP</u>

Julie also argues that the ALJ erred in giving "little weight" to the opinions of Ms. Latta. In support, Julie takes issue with the ALJ's explanation that Ms. Latta's opinions were inconsistent with her own treatment notes and other medical evidence, stating this could not "be further from the truth" as the notes "convincingly document a long-term history of depression, anxiety, panic attacks, and PTSD" which all contribute to marked and extreme functional limitations. Pl.'s Br. at 10, Dkt. 16. Ms. Latta filled out a medical source statement in 2018 indicating that Julie had marked or extreme limitations in almost all areas of mental functioning. R. 1244-46.

The ALJ discounted Ms. Latta's opinion as inconsistent with her own treatment notes and other medical evidence, and also noted that Ms. Latta partially based her opinion on Julie's physical impairments, including alleged chronic pain and chronic diarrhea, even though, as a QMHP, Ms. Latta is not qualified "to treat or assess physical impairments." R. 31. For similar reasons as outlined above related to Dr. Byrd, including largely normal mental status findings, substantial evidence supports the ALJ's decision to give Ms. Latta's opinions little weight. The ALJ also highlighted how Julie told Ms. Latta that "beginning to work 20 hours a week in a convenience store" actually helped her mental symptoms, including a self-esteem increase, less stress, and less isolation; significantly, Ms. Latta counseled her on the benefits of working, and did not caution her against working or any potential detriment to her mental health. R. 31. At bottom, Julie simply disagrees with how the ALJ weighed the evidence in the record; however, I find the ALJ's decision supported by substantial evidence.

Additionally, Ms. Latta, as a QMHP, is not a medical source as defined by the Act. 20 C.F.R. §§ 404.1513, 416.913 (indicating "[w]e need evidence from acceptable medical sources

14

to establish whether you have a medically determinable impairment" and defining acceptable medical sources as licensed physicians, licensed or certified psychologists, and—for limited purposes—licensed optometrists, licensed podiatrists, and qualified speech-language pathologists). Though an ALJ has a duty to consider all of the evidence available in a claimant's case record, including evidence provided from medical sources who are not "acceptable medical sources" such as a nurse practitioner, these opinions are not entitled to any particular weight. Ingle v. Astrue, 1:10CV141, 2011 WL 5328036, at *3 (W.D.N.C. Nov. 7, 2011) (citing Social Security Ruling ("SSR") 06–03p, 2006 WL 2329939 (SSA)(Aug. 9, 2006); 20 CFR §§ 404.1513(d), 416.913(d)); see also Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996) (finding no error in ALJ's failure to expressly weigh the opinion of claimant's physical therapist). Here, the ALJ considered Ms. Latta's professional qualifications, including that she was a QMHP and saw Julie "frequently", as well as the weight of the evidence supporting her opinion, and her opinion's consistency with the other relevant evidence in the record.[17] R. 31. Contrary to Julie's complaints, the ALJ used the proper standard to weigh Ms. Latta's opinion, and adequately explained his conclusions.

### D. Part-Time Work

Julie asserts that that the ALJ over-emphasized the significance of her ability to work part-time in concluding that she was not disabled. Specifically, Julie points to the ALJ's statement that, while Julie was working only 20 hours a week, "nothing in . . . the medical

---

[17] To determine the weight given to the opinion of a source who is not an "acceptable medical source" as defined by the Act, the ALJ should consider: (1) the length of time the source has known the claimant and the frequency of their contact; (2) the consistency of the source's opinion with the other evidence; (3) the degree to which the source provides supportive evidence; (4) how well the source explains his or her opinion; (5) whether the source has an area of specialty or expertise related to the claimant's impairments; and (6) any other factors tending to support or refute the opinion. Beck v. Astrue, 3:11–CV–00711, 2012 WL 3926018, at *12 (S.D.W. Va. Sept. 7, 2012) (citing SSR 06–03p).

evidence record suggests that [Julie] would have adequate functioning at a part-time job but significantly worse functioning at a full-time job." R. 31. However, I find that the ALJ appropriately considered Julie's part-time work as part of his assessment of her disability. The ALJ found that Julie's part-time work of 20 hours a week did not rise to the level of substantial gainful activity. R. 17. However, work activity that is not substantial gainful activity is still "evidence relevant to the severity of [Julie's] impairment[s]," and can be considered in assessing the severity of a claimant's symptoms. See 20 C.F.R. § 404.1529(c).

I recognize that the ability to do part-time work, or do various other daily activities, does not dictate that a claimant can also work full-time. See Brown v. Comm'r Soc. Sec. Admin., 873 F.3d 251, 271 (4th Cir. 2017) (finding that a claimant's ability to perform some daily activities, such as a limited amount of laundry or cooking, does not mean she is able to "persist through an eight-hour workday"). Still, even part-time work such as Julie performed, "can be considered by an ALJ in determining whether a claimant is able to do more work than [] she is alleging." Katrina A. v. Saul, No. CV TMD 18-1070, 2019 WL 4059896, at *5 (D. Md. Aug. 28, 2019) (citation omitted). Here, the ALJ highlighted, among numerous other inconsistencies, Julie's hearing testimony that she had not worked significantly since her alleged onset date in 2015, when the record showed she actually "was earning about $800 per month and working about 20 hours per week at a convenience store." R. 33.[18] I find that the ALJ properly considered Julie's part-time work, as just one factor among many others in the record. Accordingly, I conclude that the ALJ's determination is supported by substantial evidence, and that Julie is capable of performing work at the level stated in the ALJ's opinion.

---

[18] The ALJ asked, "Other than working for the Salvation Army [for a week in 2017], since June of 2015 have you worked for any other employer, or performed any self-employment work?" Julie responded, "No." R. 47.

**CONCLUSION**

It is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case Elizabeth K. Dillon United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objections, including the waiver of the right to appeal.

Entered: May 20, 2021

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge